**Lynne SCHOONOVER, M.D., Appellant,**

v.

**Beverly Bass CHAVOUS, Guardian Ad Litem for Alante Maybin, a Minor, et al., Appellees.**

No. 06–CV–213.

District of Columbia Court of Appeals.

Argued May 20, 2008.

Decided July 2, 2009.

Alfred F. Belcuore, Washington, DC, for appellant.

Marc Fiedler, with whom William P. Lightfoot, Paulette E. Chapman, and Kelly J. Fisher, Washington, DC, were on the brief, for appellees.

Before REID, FISHER, and BLACKBURNE–RIGSBY, Associate Judges.

FISHER, Associate Judge:

A jury found Dr. Lynne Schoonover liable in the amount of $3,050,000 for medical

malpractice. Thereafter, the trial court determined that The George Washington University ("GWU"), which had settled with the plaintiffs prior to trial, was a joint tortfeasor responsible for the concurrent negligence of its nurses. The court concluded that Dr. Schoonover was entitled to *pro rata* credit and entered judgment against her in the amount of $1,525,000, representing one-half of the jury's verdict.

Dr. Schoonover no longer asks for a new trial, but she seeks to reduce the amount of the judgment against her. The doctor asserts that the Superior Court should have allowed her to withdraw her cross-claim for contribution against GWU. Absent the court's finding on the cross-claim that GWU was a joint tortfeasor, Dr. Schoonover would have been entitled to *pro tanto* credit for the full amount of GWU's settlement ($2.1 million), thus reducing her liability by $575,000.[1] Finding no abuse of discretion by the trial court, we affirm.

## I. The Factual Background

In January 2000, Sherri Maybin and her son Alante Maybin were participants in the GWU Health Plan ("Health Plan") and Alante Maybin was a patient of GWU Pediatrics, which provided a call service for patients to speak with nurses and doctors outside clinic hours. Dr. Schoonover was not employed by GWU, but she and the physicians in GWU's Pediatric Division had entered into an agreement whereby they took turns answering after-hours calls for each other. During the early morning hours of January 18, 2000, Dr. Schoonover was on call.

On the evening of January 17, Alante Maybin, who was six years old at the time, had been ill for several days; he was acting sleepy and had a headache, a sore throat, and stomach pains. Ms. Maybin called the GWU Pediatrics advice line and spoke with Bernadette Deely, a nurse at GWU, who said Alante probably had a virus and advised Ms. Maybin to make sure her son drank plenty of fluids. Ms. Maybin called the advice line again the next morning because her son was getting worse. When Dr. Schoonover returned the call, Ms. Maybin explained that Alante had diarrhea, red eyes, a fever of 103 to 104 degrees, white spots on his tongue, and stomach pains. He was vomiting and sleepy, and he was not urinating. Dr. Schoonover told Ms. Maybin to call the pediatric practice clinic and tell them to give her a morning appointment to see the first available doctor. When Ms. Maybin placed that call, she spoke with Emily Campbell, a nurse at GWU Pediatrics, who also told Ms. Maybin to take Alante to the clinic.

While Ms. Maybin was making arrangements for transportation, Alante collapsed. Ms. Maybin called 911 and an ambulance rushed her son to Children's Hospital. Alante was diagnosed with an invasive Group A strep infection and toxic shock. His blood circulation was compromised when many of his organ systems shut

---

1. *See Washington v. Washington Hospital Center*, 579 A.2d 177, 185 n. 10 (D.C.1990) ("As used here and in our decisions, *pro tanto* refers to a dollar-for-dollar credit against the jury verdict in the amount of the settlement. *Pro rata* refers to a proportional credit, based on the number of settling defendants versus non-settling defendants."); *see also District of Columbia v. Shannon*, 696 A.2d 1359, 1367 (D.C.1997) (explaining that for a defendant to receive a *pro rata* credit, "the liability of the settling defendants must be established either by adjudication, or by stipulation between the plaintiff and the settling defendant.") (citation omitted); *Berg v. Footer*, 673 A.2d 1244, 1248–49 (D.C.1996) ("When the plaintiff has settled with a party whose culpability has not been determined, or with a party whom the finder of fact has found not liable, the court awards the nonsettling defendant a credit against the verdict in the amount of the settlement, dollar-for-dollar (*pro tanto*).").

down, and both of his legs had to be amputated below the knee.

Plaintiffs presented expert testimony to support their theory that the standard of care required the nurses and the doctor to follow up with Ms. Maybin and advise her to take her son directly to the nearest emergency room. Dr. Schoonover, Nurse Deely, and Nurse Campbell had all spoken with Ms. Maybin about Alante's condition, but none of them told Ms. Maybin that the situation was an emergency or advised her to immediately take her son to the nearest emergency room. According to expert testimony presented at trial, in cases of sepsis "minutes can make a significant difference," and if Alante had been taken to the emergency room immediately after any of the three phone calls Ms. Maybin made to the after hours line, the emergency treatment would have prevented most of the complications Alante experienced.

## II. The Procedural Background

As amended, the complaint filed by Sherri Maybin, individually and on behalf of her minor son, Alante Maybin, alleged that both GWU and Dr. Schoonover were liable for medical malpractice. (In an order dated July 6, 2005, Beverly Bass Chavous was appointed Guardian Ad Litem and was added as plaintiff.) On December 17, 2004, the plaintiffs agreed to settle their claims against GWU; that agreement was memorialized on August 4, 2005, and the court approved it.

In the meantime, Dr. Schoonover requested leave to file a cross-claim against GWU. Both the plaintiffs and GWU opposed, but the court granted leave on March 10, 2005. In her cross-claim, Dr. Schoonover alleged that GWU "is or may be liable to [her] by reason of indemnity and/or contribution...."

The claims against Dr. Schoonover proceeded to trial before a jury on November 7, 2005. During that trial (on November 10 and 16), Dr. Schoonover presented evidence to the court, outside the presence of the jury, regarding GWU's negligence and the causal link between that negligence and Alante Maybin's injuries. On November 16, the court took the cross-claim under advisement. The jury returned its verdict on November 17, 2005. A few days later, the court entered partial judgment against Dr. Schoonover in the amount of $3,050,000, with interest, "subject to amendment once the cross-claim of Defendant, Lynne Schoonover, M.D., against the settling Defendant, The George Washington University[,] is resolved by the Court."

Following the verdict, Dr. Schoonover sought credit against the judgment. We describe her motion in more detail below, but it included a request that her cross-claim for contribution be dismissed and that she be given a *pro tanto* credit of $2.1 million (the amount of GWU's settlement).[2] Such credit would have reduced the judgment against her to $950,000.

On January 24, 2006, the trial court denied Dr. Schoonover's motion to dismiss her cross-claim for contribution (and her request for a *pro tanto* credit). That same day, the court issued findings of fact and conclusions of law, ruling that GWU was a joint tortfeasor responsible for the negligence of Nurses Deely and Campbell. Accordingly, the court entered a final judgment against Dr. Schoonover in the amount of $1,525,000, reflecting a *pro rata* credit for GWU's liability as a joint tortfeasor.

## III. Rule 41 and Our Standard of Review

Civil Rule 41(a) governs the voluntary dismissal of actions and applies as well "to

---

**2.** Dr. Schoonover pursued her claim for indemnification, which the court denied in an order issued on January 17, 2006. She does not contest that ruling on appeal.

the dismissal of any counterclaim, cross-claim, or 3rd-party claim." Super. Ct. Civ. R. 41(c). A plaintiff may dismiss an action without leave of court if he does so before an adverse party has filed an answer or a motion for summary judgment ("whichever first occurs"), or "by filing a stipulation of dismissal signed by all parties who have appeared in the action." Super. Ct. Civ. R. 41(a)(1). Because Dr. Schoonover waited too long to dismiss her cross-claim as a matter of right, and did not have a stipulation of dismissal signed by all parties, her request was governed by Rule 41(a)(2), which provides that "an action shall not be dismissed at the plaintiff's instance save upon order of the Court and upon such terms and conditions as the Court deems proper." Super. Ct. Civ. R. 41(a)(2).

■ Although this portion of Rule 41 is awkwardly worded, the trial court has discretion "not only as to the terms and conditions imposable upon the grant of the motion, but also upon the question whether the dismissal shall be permitted." *Raney v. District of Columbia Transit System, Inc.*, 166 A.2d 261, 262 (D.C.1960). *Accord, Grivas v. Parmelee Transportation Co.*, 207 F.2d 334, 336–38 (7th Cir.1953) (overruling prior precedent and joining other federal circuits to hold that "whether the dismissal should be allowed and, if so, the terms and conditions to be imposed, are matters within the sound judicial discretion of the District Court."); 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL 3d § 2364, at 458 (3d ed. 2008) ("The grant or denial of a dismissal on motion under Rule 41(a)(2) is within the sound discretion of the trial court. . . .").[3]

■ "The requirement of judicial approval and the provision for court-imposed conditions [in Rule 41(a)(2) ] were intended to curb the abuses at common law (and in federal practice) of automatically granting voluntary dismissals anytime before verdict was rendered." *Conafay v. Wyeth Laboratories*, 253 U.S.App. D.C. 279, 280 n. 1, 793 F.2d 350, 351 n. 1 (1986); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397–98, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (discussing "the policy and purpose of Rule 41(a)(1), which was designed to limit a plaintiff's ability to dismiss an action"). Thus, when Rule 41(a)(2) applies, "[a] voluntary dismissal is no longer a matter of right." *Raney*, 166 A.2d at 262; *accord, Grivas*, 207 F.2d at 336 (agreeing with other courts and textbook writers that "the allowance of a motion to dismiss under Rule 41(a)(2) is not a matter of absolute right").

■ "The trial court's decision to permit [or deny] a voluntary dismissal pursuant to Rule 41(a)(2) is discretionary, and we must uphold its decision unless we find an abuse of discretion." *Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1211 n. 8 (D.C.2002) ("*Thoubboron III*"). As we have often stated, "The concept of 'exercise of discretion' is a review-restraining one. The appellate court role in reviewing 'the exercise of discretion' is supervisory in nature and deferential in attitude." *Johnson v. United States*, 398 A.2d 354, 362 (D.C.1979); *see id.* at 361 ("Discretion signifies choice.").

■ Nevertheless, the court's "discretion must . . . be exercised in conformity with correct legal principles," *Thoubboron v. Ford Motor Co.*, 624 A.2d 1210, 1213

---

**3.** "Superior Court Rule 41 is 'substantially identical' to the corresponding federal rule and is 'to be construed in light of the meaning of that federal rule.' " *Dorchester House Associates Limited Partnership v. District of Columbia Rental Housing Commission*, 913 A.2d 1260, 1265 (D.C.2006) (citing *Waters v. Castillo*, 755 A.2d 478, 481 (D.C.2000), and *Taylor v. Washington Hosp. Ctr.*, 407 A.2d 585, 590 n. 4 (D.C.1979)).

(D.C.1993) ("*Thoubboron I*"), which we and other courts have articulated. "In order to facilitate judicial review and to ensure that the trial court's discretion has been judiciously exercised, a trial judge who denies a motion for voluntary dismissal may be called upon to explicate his or her reasons for doing so, at least where the consequence of that denial is likely to be a definitive resolution of the action against the movant." *Id.* at 1214.

## IV. Legal Analysis

We first consider the nature of appellant's motion, and the circumstances in which it was filed. After all the evidence had been presented on the issue of contribution, and after the trial court had taken her cross-claim against GWU under advisement, Dr. Schoonover filed a "Motion for Application of Credit Resulting From Settlement Between Plaintiff and Co–Defendant." In this motion, appellant presented alternative requests, seeming to acknowledge that there were valid options from which the trial court could choose. "[W]ithout relinquishing her crossclaim against GWU for indemnity, Dr. Schoonover respectfully request[ed] that [the trial court] modify and reduce the judgment on the verdict against her to $950,000 ($3.05 million less a $2.1 million credit) and dismiss her crossclaim for contribution only." (underlining in original). (This would have been a *pro tanto* credit and clearly was her preference.) "[I]n the alternative (and without relinquishing her crossclaim against GWU for indemnity), Dr. Schoonover ... request[ed] that [the trial court] find in favor of her on her crossclaim for *contribution* and modify and reduce the judgment against her to the amount of $1,525,000 ($3.05 million less a $1,525,000 [*pro rata*] credit)." (underlining in original). Thus, Dr. Schoonover wished to proceed with her cross-claim for indemnification, but not her claim for contribution. In her motion, Dr. Schoonover acknowledged that neither plaintiffs nor GWU had opposed or contested her cross-claim for contribution. In other words, the evidence of GWU's negligence was "uncontroverted."

The trial court carefully articulated its reasons for denying the motion, noting that the parties did not dispute the law governing awards of *pro rata* and *pro tanto* credit. Application of this law depended on whether the settling defendant had been found to be (or had been stipulated to be) a joint tortfeasor.[4] The court recognized that it was called upon to exercise discretion: "[T]he central and determinative issue is whether dismissing Dr. Schoonover's cross-claim is appropriate *under the given circumstances.*" (emphasis added).

## A. Did the Plaintiffs Have Standing to Object?

■ The court first determined that the plaintiffs had standing to oppose the motion. Because the plaintiffs were bound by their settlement agreement "to defend, indemnify and hold harmless GWU from and against Dr. Schoonover's cross-claims for contribution and indemnity," they effectively stood in GWU's shoes with respect to that cross-claim. Moreover, the plaintiffs were not asserting a generalized grievance, but were opposing a threatened financial injury particular to them. "[I]f Dr. Schoonover's Motion is granted and a *pro tanto* credit is applied, the Plaintiff's final judgment will be $575,000 less than a judgment after a *pro rata* credit is applied."

To be sure, the plaintiffs would recover the full amount of the verdict even if a *pro tanto* credit were applied. Nevertheless, as we discuss below, this court has allowed plaintiffs, in comparable circumstances, to recover more than the full amount award-

4. See note 1, *supra*.

ed by the jury. See note 9, *infra.* Therefore, a very large sum was at stake, and the plaintiffs had a real and substantial interest in the trial court's ruling. Under these circumstances; the trial court properly accorded the plaintiffs standing to oppose Dr. Schoonover's motion to dismiss her cross-claim.

■ Relying on two cases from Maryland, Dr. Schoonover asserts that the trial court should not have considered the plaintiffs' opposition to dismissal because they were not parties to the cross-claim. Given the difference in circumstances, we do not find the broad language in those decisions to be persuasive, and they are not binding upon us in any event.[5]

In *Murphy v. Board of County Commissioners,* 13 Md.App. 497, 284 A.2d 261 (Ct.Spec.App.1971), "each defendant moved to dismiss its crossclaim with prejudice [after all evidence was closed], and each consented to the other's dismissal." *Id.* at 267. "Counsel for [the plaintiff] objected, stating that he deemed it wise as a matter of strategy that they stay in." *Id.* After the trial court granted the motions to dismiss, the plaintiff asked for an instruction informing the jury that the cross-claims would not be considered because they had been dismissed. *Id.* On appeal, the plaintiff claimed that denial of this instruction was error, but the Court of Special Appeals affirmed. Although the appellate court stated that it knew "of no principle or rule that a plaintiff has any rights arising from crossclaims among defendants[,]" *id.* at 268, this dictum does not control our decision here, and the court

was not considering comparable factual circumstances. Most importantly, both defendants remained in the case and were "equally exposed to a jury determination of the liability or non-liability of each." *Id.* at 268. As it happened, the jury returned a verdict in favor of the defendants, so the court was not faced with issues of *pro rata* or *pro tanto* credit. *Id.* at 264.

In *Garlock, Inc. v. Gallagher,* 149 Md. App. 189, 814 A.2d 1007 (Ct. Spec.App.2003), the same court held "the trial court erred in ruling that [a] stipulated dismissal was a nullity," concluding that "[o]nce the actual parties to the cross-claim stipulated a dismissal, the Gallagher plaintiffs—and the trial court—had no voice to contest it." *Id.* at 1018. Acknowledging that plaintiffs have an interest in determining the number of joint tort-feasors and the amount each owes, the court stated that "[t]hat interest does not empower them, however, to force a defendant to prosecute a claim that may benefit plaintiffs." *Id.*

Our case does not involve a stipulation of dismissal, nor did the trial court require Dr. Schoonover to undertake any future prosecution. Although GWU did not file an opposition to Dr. Schoonover's motion, neither did it sign a stipulation of dismissal. And such a stipulation might not have been effective in these circumstances. Given the terms of the settlement agreement, the plaintiffs stood in GWU's shoes. We do not find *Murphy* and *Garlock* sufficiently compelling that we should overturn the trial court's decision to consider the interests of the plaintiffs.[6]

---

**5.** Although "[w]e ordinarily turn to the common law of Maryland for guidance when there is no District of Columbia precedent on an issue," *George Washington University v. Scott,* 711 A.2d 1257, 1260 n. 5 (D.C.1998) (citing *Napoleon v. Heard,* 455 A.2d 901, 903 (D.C.1983)), we are not obliged to do so, and here we find the Maryland cases cited by

appellant to be distinguishable and unpersuasive.

**6.** Counsel for appellees has suggested that the persuasive value of *Murphy* and *Garlock* may also be affected by differences between our case law governing contribution and the Maryland Uniform Contribution Among Joint Tort-feasors Act, MD CODE ANN., CTS. & JUD. PROC.

## B. The Court's Exercise of Discretion

■ The trial court suggested at the outset that Dr. Schoonover was acting in bad faith, but we cannot agree with this portion of its reasoning. This court has obliged defendants to file cross-claims for contribution at an early stage of litigation, often when it is not clear whether *pro tanto* or *pro rata* credit will be more advantageous to the client. *See generally George Washington University v. Bier,* 946 A.2d 372 (D.C.2008). It is only natural that counsel would reassess that decision when more information becomes available, and the size of the jury's verdict in relation to the amount of the settlement is a key piece of data. Indeed, a legally-trained observer justifiably might criticize Dr. Schoonover's counsel if he had not sought to withdraw the cross-claim under these circumstances.

Nevertheless, the court articulated independent grounds for denying the motion ("even if such a tactical move constitutes good faith"), and the fact that it had become more advantageous for her to drop the cross-claim does not mean that Dr. Schoonover was entitled to do so. A party is not necessarily allowed to revisit this decision after she has collected the optimal amount of information. At this point in the litigation, as we have demonstrated, Rule 41(a)(2) placed the decision to dismiss beyond counsel's control and within the discretion of the trial court.

■ In ruling on a motion for voluntary dismissal, the trial court examines "whether the defendant will be subjected to legal prejudice if the court grants the motion." *Washington Metropolitan Area Transit Authority v. Reid,* 666 A.2d 41, 45 (D.C.1995) (citations and punctuation omitted). Stating that "[a]ctual prejudice at a given point in time does not necessarily translate into legal prejudice[,]" *id.* at 46, we have characterized legal prejudice as "a real and substantial detriment." *See Thoubboron I,* 624 A.2d at 1213 ("To compel a favorable ruling the defendant must show a real and substantial detriment.") (citations omitted); *Brown v. Carr,* 503 A.2d 1241, 1248 (D.C.1986). Although this is not a well-defined concept,[7] it would ignore reality to say that reducing the amount of recovery by $575,000 would not constitute a real and substantial detriment to the plaintiffs. This threat of legal prejudice to the plaintiffs called for an exercise of the trial court's discretion.

When assessing prejudice in this case, the court relied particularly on factors outlined in *County of Santa Fe v. Public Service Co. of New Mexico,* 311 F.3d 1031 (10th Cir.2002),[8] noting that the list was

§ 3–1401 through 3–1409 (2009). Fortunately, we do not find it necessary to enter this analytical thicket.

7. The mere prospect of facing a second lawsuit does not meet that test. *See Thoubboron I,* 624 A.2d at 1213–14 ("It is not enough [to establish legal prejudice] that [the defendant] may be forced to suffer the incidental annoyance of a second suit in another forum.") (citations omitted). Moreover, the court often may impose terms and conditions that compensate a defendant for the wasted expenditure of funds. *See* Super. Ct. Civ. R. 41(a)(2) ("an action shall not be dismissed at the plaintiff's instance save upon ... such terms and conditions as the Court deems proper"); *Thoubboron I,* 624 A.2d at 1216 n. 12 (The trial court "may of course impose reasonable conditions, *e.g.,* that the plaintiffs ... shall compensate the defendant for its costs and counsel fees incurred in defending against what has turned out to be the plaintiffs' improvident foray into the courts of this jurisdiction.").

8. In *County of Sante Fe,* the Tenth Circuit stated that among the factors to be considered by a trial court in determining whether to grant a motion for voluntary dismissal are: "the opposing party's effort and expense in preparing for trial; excessive delay and lack of diligence on the part of the movant; insufficient explanation of the need for a dismissal; and the present stage of litigation." 311 F.3d at 1048 (citations and punctuation omitted).

not exclusive "and factors that are unique to the context of the case must also be considered." *Id.* at 1048 (internal quotation marks omitted). The court emphasized that Dr. Schoonover had "presented her evidence against GWU and otherwise fully tried her cross-action to the trial's conclusion." She "ha[d] made her motion to dismiss at the very final stage of this litigation, where all that remains is the Court's determination of GWU's negligence." The only apparent change in circumstances had been the return of the jury's verdict, and the court concluded that plaintiffs "would suffer legal prejudice as a result of dismissal." "Under such circumstances, Dr. Schoonover ha[d] failed to demonstrate that dismissal would be appropriate."

We have said that "the court must exercise its broad equitable discretion under Rule 41(a)(2) to weigh the relevant equities and do justice between the parties in each case...." *Thoubboron III,* 809 A.2d at 1214 (citation and internal quotation marks omitted). As able counsel have demonstrated, there are equities on both sides of this case. For example, it is unusual for plaintiffs to recover more than the full amount awarded by the jury. Nevertheless, we have approved that outcome in comparable circumstances.[9] And it would be anomalous to apply a *pro tanto* credit when Dr. Schoonover had already demonstrated without contradiction that GWU

was a joint tortfeasor. All that remained was the court's ruling.[10]

At the end of the day, well-established and undisputed legal rules were applied to a fully litigated assessment of all the circumstances. There was no abuse of discretion here, and the judgment of the Superior Court is hereby

*Affirmed.*

---

In light of the discussion above, we do not consider appellant to be guilty of excessive delay or a lack of diligence. Rather, "the present stage of litigation" is the most important consideration in our case.

9. *See Berg v. Footer,* 673 A.2d 1244, 1255–57 (D.C.1996); *id.* at 1256 ("It seems to us that a plaintiff's good fortune in striking a favorable bargain with one defendant gives other defendants no claim to pay less than their proportionate share of the total loss.") (citation omitted); *Chidel v. Hubbard,* 840 A.2d 689, 699 n.

11 (D.C.2004) (noting that a *pro rata* credit should be applied when the settling defendant is a joint tortfeasor, even where that credit "when added to [the] amount recovered in settlement, will result in a recovery to the plaintiff that exceeds the jury verdict").

10. We need not opine as to whether it would have been appropriate for the trial court to have granted Dr. Schoonover's motion to dismiss if her cross-claim had not already been fully tried and taken under advisement.